[Civ. No. 20343. Second Dist., Div. Three. Jan. 20, 1955.]

TRINIDAD FLORES et al., Appellants, v. SAM BARMAN et al., Respondents.

Margolis, McTernan & Branton and John T. McTernan for Appellants.

Gendel & Raskoff and H. Miles Raskoff for Respondents.

VALLÉE, J.—Appeal by petitioners from a judgment denying an application to confirm an award of an arbitrator and modifying the award.

Petitioners are officers of Furniture Workers, Upholsterers and Wood Workers Union, Local 576. They instituted the proceeding on behalf of the union and its members. Crown Upholstering Company, referred to as "the company," is a partnership and the employer of members of the union. On October 1, 1951, the company and the union entered into a collective bargaining contract. The pertinent parts of the contract (article XIV) read:

"(a) This Agreement shall remain in full force and effect

until September 1, 1953, and thereafter annually; provided, however, that either party may terminate this Agreement or give notice of a desire to modify any portion thereof on said date, or at the end of any subsequent yearly period, by notifying the other party in writing to that effect not less than sixty (60) days prior to said date or not less than sixty (60) days prior to the end of any subsequent yearly anniversary.

"(b) Negotiations upon a new or modified Agreement shall commence not later than twenty (20) days next following the receipt of said written notice. Pending agreement on a new or modified Agreement this Agreement shall remain in full force and effect. The provisions of the new or modified Agreement shall be retroactive to the expiration date of the then current Agreement."

The contract provided for the submission of unsettled controversies between the company and the union to an "Impartial Umpire" for decision and,

"Every decision of the Impartial Umpire shall be retroactive to and take effect as of the date upon which the controversy originally occurred. The decision of the Impartial Umpire shall be final and binding upon the Union and the Employer. . . . *The Impartial Umpire shall at all times be governed by the terms of this Agreement and shall have no power or authority to change the Agreement in any respect or to add or take away from its terms.* (Italics added.)"

On June 26, 1953, the company in writing notified the union it intended to terminate the contract on its expiration date, September 1, 1953. The writing further stated:

"You are further notified that Crown Upholstering Company offers to meet with any authorized representatives of the Union for the purpose of negotiating a new contract, and will arrange a mutually satisfactory time and place for such negotiations, at any time after receipt by you of this notice and prior to September 1, 1953.

"You are further advised that if no agreement is reached on or before September 1, 1953, it is the intention of Crown Upholstering Company by this notice to terminate absolutely any and all obligations under the existing agreement as of September 1, 1953, and particularly any obligation to keep the existing agreement in force after September 1, 1953, or to make any new agreement retroactive to September 1, 1953.

"This notice is intended as the Notice of Termination referred to in Paragraph XIV of the existing Labor Agreement,

and also in accordance with the provisions of Section 8(d) of the Labor-Management Relations Act of 1947.''

Petitioners replied in writing on July 1, 1953, stating the company's notice was in violation of the contract, by its terms the contract was to remain in effect pending negotiations toward a new one, and the new contract was to be retroactive to September 1, 1953.

On July 6, 1953, the company in writing denied the notification of June 26 constituted a violation of the contract; stated it had always complied with the terms of the contract and would continue to do so for its full term; reiterated its intention to "terminate absolutely any and all obligations under the existing agreement as of September 1, 1953"; and repeated the statement of its intention to negotiate with the union for a new contract to commence at the expiration of the existing contract. Negotiating meetings without results were held by the parties on July 3 and 10. Another union claimed to represent a majority of the employees of the company. Petitioner-union petitioned the National Labor Relations Board for an election. On July 23, 1953, the company in writing asked the union if, in view of the question of representation, it (the union) thought "it would be proper for the employer to carry on further negotiations with you before this question is determined." On August 5 a hearing was held by the National Labor Relations Board. The other union notified the board it did not desire to intervene. The company advised the board that inasmuch as the other union did not represent a majority of the employees, it desired to resume negotiations with petitioner-union. On August 6, 1953, the union requested resumption of negotiations.

Without waiting for a reply from the company, the union, on August 6, requested the "Impartial Umpire" to arbitrate the controversy—with the statement that the issue was:

"Has the Company the unilateral right to abrogate Article XIV (b) and does the Contract continue in full force and effect after September 1, 1953, pending negotiations and agreement on a new Agreement.''

On August 7 the company expressed a willingness to resume negotiations. Nevertheless, the "Impartial Umpire" proceeded to hear the matter on August 11. The company objected to arbitration, and reserved its objection at all times, contending before the "Impartial Umpire" that the right to terminate the contract was purely a matter of law and that

there was no decision an arbitrator could make in the matter. The award of the "Impartial Umpire," made on August 17, was:

"The Company does not have the unilateral right to abrogate Article XIV(b) and the Contract continues in full force and effect after September 1, 1953 pending negotiations and agreement on a new Agreement or until all negotiations end."

After the award, the company again expressed a willingness to continue negotiations in an effort to reach a new contract by September 1, 1953.

On September 10, 1953, the union applied to the superior court for an order confirming the award. The company answered and filed a counterapplication for an order vacating the award. The court denied the application to confirm, denied the application to vacate, and modified the award to provide:

"The Company does have the right to terminate that certain collective bargaining agreement dated October 1, 1951, on its expiration date, to wit, September 1, 1953, by virtue of the written notice given by the Company to the Union on June 26, 1953."

The union appeals.

Appellants' contentions are: 1. The trial court erred by examining the merits of the controversy decided by the arbitrator and substituting its judgment for that of the arbitrator. 2. In any event, the arbitrator's construction of the contract is sound, as a matter of law.

 Construction of the contract involved a pure question of law. No extrinsic evidence was received by the arbitrator. The interpretation of a written instrument based solely on the terms of the instrument without the aid of extrinsic evidence presents a question of law. (*Western Coal & Min. Co.* v. *Jones,* 27 Cal.2d 819, 826-827 [167 P.2d 719, 164 A.L.R. 685].)

 The superior court must make an order vacating the award where the arbitrator exceeded his powers. (Code Civ. Proc., § 1288 subd. (c).) Petitioners assert that the merits of the controversy and errors of law are not reviewable. The question is not one of review of the issues before the arbitrator. It is one of determining his powers. "[*I*]*n the absence of some limiting clause in the arbitration agreement,* the merits of the award, either on questions of fact or of law, may not be reviewed except as provided in the statute." (*Crofoot* v. *Blair Holdings Corp.,* 119 Cal.App.2d 156, 186 [260 P.2d 156].) (Italics added.)

■ The powers of the arbitrator are derived from and limited by the contract. (*Bierlein* v. *Johnson*, 73 Cal.App.2d 728, 733 [166 P.2d 644].) He has no legal right to decide a question which the contract expressly says he shall have no power to decide. If in the present case he decided such a question, the trial court properly held he exceeded his powers. (*Bierlein* v. *Johnson, supra.*) In *Screen etc. Guild* v. *Walt Disney Productions*, 74 Cal.App.2d 414 [168 P.2d 983], the contract provided that any ruling or decree of the arbitrator "shall not be in conflict with the express provisions of this agreement" and "this agreement shall constitute the basis upon which such decision shall be rendered." The contract in the 13th clause provided that five days shall constitute a "work week." The arbitrator ruled that the "work week" mentioned in the contract was a seven-day week. The court held (p. 418): "[I]n construing the work week to include Saturday, the arbiter's ruling was in direct conflict with the express terms of the bargaining contract, and thus exceeded the powers conferred upon him under clause thirteenth, heretofore quoted." (See also *Hanes* v. *Coffee*, 212 Cal. 777, 779-780 [300 P. 963]; *Drake* v. *Stein*, 116 Cal.App.2d 779, 784 [254 P.2d 613]; *Stetson* v. *Orland Oil Syndicate, Ltd.*, 42 Cal.App.2d 139, 143 [108 P.2d 463].)

■ In the case at hand it is clear that the arbitrator exceeded his powers. The contract expressly provided that he should have no authority to change the contract "in any respect or to add or take away from its terms." As we shall see, he not only changed the contract, he rewrote it and extended its life beyond the time expressly provided therein. The award amounted to a complete negation of the contract.

The Labor Management Relations Act of 1947, § 8(d), (29 U.S.C.A. § 158(d)) provides that where there is in effect a collective bargaining contract covering employees in an industry affecting commerce the duty to bargain collectively shall mean that no party to the contract shall terminate it unless the party desiring termination: (1) serves a written notice on the other party to the contract of the proposed termination 60 days prior to the expiration date; (2) offers to meet and confer with the other party for the purpose of negotiating a new contract; (3) notifies the federal and state mediation and conciliation services within 30 days after such notice of the existence of a dispute; (4) continues the existing contract in full force and effect for a period of 60 days after such notice is given or until the expiration date of

the contract, whichever occurs later.[1] The notices were given to the federal and state conciliation services by the company. Congress, in enacting section 8(d), specified that the reasonable notice of termination would be 60 days. (*Boeing Airplane Co.* v. *National Labor Relations Board*, (Dist.Col. Cir.) 174 F.2d 988, 991.)

Article XIV(a) of the contract gives an absolute power of termination. The union argues that under article XIV(b), if the power to terminate the contract is exercised and if negotiations do not result in a new agreement by the terminal date, the old agreement remains in force while negotiations continue and the new agreement is retroactive to the expiration date.

*Paterson Parchment P. Co.* v. *International Brotherhood,* (3 Cir.) 191 F.2d 252, cert. den. 342 U.S. 933 [72 S.Ct. 376, 96 L.Ed. 694], is directly in point and determinative of the proper construction of the contract in the case at bar. The contract in that case provided:

"This agreement shall be in effect from August 15, 1947 to August 15, 1948 and thereafter from year to year, pro-

---

[1]Section 8(d) in part reads: "(d) For the purposes of this section to bargain collectively is the performance of the mutual obligations of the employer and the representatives of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification——

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later. . . ."

vided, however, that either party may terminate the same on not less than sixty (60) days written notice given to the other prior to the anniversary date.

"However, should there be a delay in negotiating the new agreement, this agreement shall remain in full effect until such time as a new agreement is completed."

On June 1, 1948, the defendants gave the plaintiff a 60-day notice of termination of the contract. The plaintiff claimed that the defendants had breached the contract by a strike called on August 20, 1948. The question was whether the contract had been terminated on August 15, prior to the strike called on August 20. The court held (p. 254):

"Intended as notice of termination, the words used are adequate for the purpose. It is true the notice envisages a continuing labor-management relationship between the parties, but under a new contract to be negotiated in the two months available before expiration of the old contract. As concerns the old contract, the notice is a plain manifestation of unwillingness to continue under its provisions beyond its potential expiration date.

"It is also necessary to consider the meaning and effect of the language of the second paragraph of Section 15 of the contract that 'should there be a delay in negotiating the new agreement, this agreement shall remain in full effect until such time as a new agreement is completed.' The language follows immediately after the provision for 60 days notice of termination of a contract anniversary. It is obviously directed at the avoidance of a no contract situation where pending negotiation of a new contract continues beyond the notified termination of the old. It is phrased only in terms of a successful negotiation. It leaves to inference the result of unsuccessful negotiation.

"But the correct inference is not hard to draw. Negotiation is set up as a factor suspending or postponing the normal effect of notice of termination. The end of negotiation, whether success or failure, marks the end of this postponement. . . .

"In summary, the contract here required 60 days notice of termination, and appropriate notice was given. But, also in accordance with the contract, termination was suspended by negotiations toward a new contract. These failed and ended. The old contract thereupon terminated pursuant to the permitted election already made manifest by timely notice as

provided in the document itself. The obligation not to strike, like the other obligations of the contract ceased to exist.''

So in the present case the contract required 60 days' notice of termination and the notice given was adequate for the purpose. ■ The provisions of the Labor Management Relations Act of 1947 must be read as a part of the contract. The act specifies 60 days as reasonable notice of termination. Negotiations for a new contract followed almost immediately after notice of termination was given. They were interrupted by the proceeding before the National Labor Relations Board. Notwithstanding the willingness of the company to negotiate further after that proceeding ended, the union proceeded in an attempt to arbitrate a question of law before the ''Impartial Umpire.'' The contract contemplates continuing labor-management relation, but under a new contract to be negotiated within the 60 days available before expiration of the old contract. The notice of termination was a plain manifestation of unwillingness to proceed under the terms of the old contract beyond its potential expiration date. Negotiations for a new contract must commence within 20 days after the receipt of the notice of termination. ■ We think it clear that if negotiations for a new contract are not completed before the termination date, the contract terminates on that date. The negotiations appear to have come to an impasse. They began, but stopped when the union demanded arbitration. Thereafter and until September 1, 1953 the company was ready and willing to continue negotiations in an effort to reach a new contract by September 1. Instead of continuing negotiations the union waited until after September 1 and then petitioned for confirmation of the award. The contract terminated on September 1, 1953 pursuant to the notice given on June 26.

Paragraph XIV(b) is, of course, to be read with paragraph XIV(a). To give paragraph XIV(b) the construction contended for by the union would create an absurd situation—the old contract and the new contract would be in force during the same period. During the period after the expiration date, when negotiations were proceeding, the old contract would remain in force; on execution of the new contract, that contract would be retroactive to the expiration date: two contracts would be in force at the same time. The parties could not have contemplated that absurd situation. The retroactive provision simply means that if a new con-

tract is not executed before the expiration date, the new contract shall be retroactive to that date. The old contract cannot reasonably be construed to continue during a period when a new contract is in effect retroactively. We think the trial court correctly construed the contract.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied February 17, 1955. See *Estate of Schluttig*, 36 C.2d 416.