[Civ. No. 39763. First Dist., Div. One. Feb. 9, 1977.]

DELTA LINES, INC., Plaintiff and Appellant, v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
LOCAL 468, Defendant and Respondent.

**962**

COUNSEL

Littler, Mendelson, Fastiff & Tichy, Wesley J. Fastiff and Nancy L. Ober for Plaintiff and Appellant.

Brundage, Beeson, Tayer & Kovach and Kenneth N. Silbert for Defendant and Respondent.

**OPINION**

**LAZARUS, J.\***—This is an appeal by Delta Lines, Inc. (hereinafter Company) from a judgment denying its petition to vacate an arbitration award in favor of the International Brotherhood of Teamsters, Local 468 (hereinafter Union) and granting a petition to confirm the award.

The parties have stipulated that the *sole* issue that was to be submitted for arbitration was whether Company had *just cause* under a collective bargaining contract to discharge a former employee, John G. Platt. Company contends that in making the disputed award the arbitrator exceeded the scope of his authority by deciding an issue that had not been submitted to him for decision. However, the real question here

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

appears to be whether the arbitrator determined the issue that he was called upon to decide at all.

Company is a trucking firm with its principal offices at Oakland, California. Its drivers are all members of Union. Platt was one of its drivers who had worked for Company from September 22, 1972, until his employment was terminated in February 1975. His regular run was between his home terminal at Emeryville, California and Los Angeles, his layover point.

Article 51, section 2(c) of the collective bargaining contract in effect at the time provided under the heading "Call Time": "Employees shall be given at least two (2) hours notice when ordered to report for duty at the home terminal. At the away-from-home terminal, driver shall be given two (2) hours notice to report for duty unless otherwise agreed to."

On the evening of February 12, 1975, Platt was on layover in Los Angeles. According to his work schedule, he was to return to the Bay Area that night at midnight. Accordingly, Company's Los Angeles dispatcher called Platt's hotel early that evening and left a message for Platt to report for duty at the Los Angeles terminal at midnight. The hotel telephone operator called back and reported that she had been calling Platt's room but could not get an answer. The Los Angeles dispatcher then put in a call to Company's line supervisor in the Bay Area, Mr. Mooney. Mooney followed up by instructing Marvin Armstrong, Company's area safety supervisor in Los Angeles, to go to Platt's hotel to see if he could find out why he had not answered his calls. Armstrong arrived at the hotel at approximately 12:10 a.m. The desk clerk at the hotel told Armstrong that she was sure that Platt was in his room because the lights were on. She gave Armstrong a key so that he could check.

On entering Platt's room Armstrong found Platt lying in bed. He attempted to wake him up by calling his name and shaking him but was unable to arouse him. While he was there Armstrong also observed a pistol protruding from under Platt's pillow. He thereupon left the room and returned to the office of the hotel. After some discussion between Armstrong and the room clerk, she put in a call to the Huntington Park police. The police arrived and Armstrong followed them to Platt's hotel room. After several attempts, the police were finally able to awaken Platt. In the meantime, they had found a quantity of pills in the room. They confiscated the pills and arrested Platt.

Platt's run that was scheduled for departure on February 13th from Los Angeles to the Bay Area was therefore necessarily cancelled. Later, he also was unavailable for work on February 17th and 19th because in the meantime he had been in jail following his arrest until February 19th, when he was released on bail.

Prior to the foregoing incident, Platt had received eight warning letters and two suspensions for being absent from his job and he had an employment record that showed a pattern of consistent failure to report for work. On February 20, 1975, Company discharged Platt. The stated reason was his failure to be available for work on February 13, 17 and 19 and his previous disciplinary record for the same infraction.

Union submitted to the contractual grievance procedure the issue of whether Company had just cause to fire Platt as required by article 46, section 1 of their contract with the employer. After the matter was deadlocked at a hearing before the joint grievance committee, Company and Union both agreed to submit the dispute to arbitration before Homer L. Woxberg, Sr. The submission was made pursuant to article 45 of the collective bargaining contract, containing a grievance and arbitration procedure which provides that Company and Union are to submit "any controversy which may arise" to a prescribed grievance procedure. Section 1(e) of article 45 also provides that any cases deadlocked in the grievance committee "which pertain to discharge" be submitted "to umpire handling." It also includes the following clause: "*The decision of the umpire shall be specifically limited to the matter submitted to him* and he shall have no authority in any manner to amend, alter or change any provision of this Agreement." (Italics added.)

At the arbitration hearing on September 11, 1975, the parties entered into the stipulation referred to above that the sole issue for decision by the arbitrator was whether Company had just cause within the meaning of article 46, section 1 of the Union contract to discharge Platt.

On October 10, 1975, the arbitrator issued his findings and award sustaining the grievance, reinstating Platt in his former job at Company and ordering payment of back pay.

In arriving at the award, the arbitrator stated: "It is the opinion of the Arbitrator Mr. Armstrong's actions made it impossible for Grievant Platt to report for work. [¶] The Arbitrator has serious doubts that Grievant

Platt could have made an on-time departure on the 13th even if he had not been arrested.[1] The Arbitrator was not impressed with the attitude and testimony of the Grievant. *This award is based only on the fact that Management erred on February 13th by participating in a police action, resulting in an invasion of privacy."* (Italics added.)

Elsewhere, his findings opined: *"The Arbitrator recognizes that such a practice of checking on drivers when they do not respond to a call at their layover point, is not unusual.* [¶] The Arbitrator finds no objection to the actions of Area Supervisor Marvin Armstrong up to the time he left Grievant Platt's room after being unable to awaken him. *Mr. Armstrong erred in returning to the hotel office and participating in a discussion with the hotel clerk, resulting in a call to the police and accompanying them to Mr. Platt's room.* [¶] When Mr. Armstrong failed to awaken Grievant Platt, Delta's interest in the welfare of an employee should have ceased. *Mr. Armstrong's only responsibility was to report to his superiors what transpired in Grievant Platt's room.*[2] No one else [*sic*]." (Italics added.)

At the outset, we are, of course, mindful of the very limited functions of a reviewing court on appeal from the decision of an arbitrator. ■ It has long been the policy of this state to recognize and give the utmost effect to arbitration agreements. The merits of the controversy are not a proper subject for judicial scrutiny. (*Meat Cutters Local No. 439* v. *Olson Bros.* (1960) 186 Cal.App.2d 200, 203-204 [8 Cal.Rptr. 789].) "The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing. . . . 'Therefore every reasonable intendment will be indulged to give effect to such proceedings.' " (*Utah Const. Co.* v. *Western Pac. Ry. Co.* (1916) 174 Cal. 156, 159 [162 P. 631].) "This policy is especially applicable to collective bargaining agreements since arbitration under such agreements has been a potent factor in establishing and maintaining peaceful relations between

---

[1]The record of the arbitration proceeding would seem to conclusively indicate that it would in fact have been impossible for Platt to report for work at midnight that evening. When Armstrong arrived at 12:10 a.m., Platt was still in a comatose condition from which neither Armstrong nor the police officers who came later could arouse him until some time after the arrival of the latter.

[2]From what Armstrong observed he may have had good reason to believe that Platt's condition was such that his life may have been in danger. Wouldn't it take a rather calloused person to walk away without letting someone on the premises know that Platt might be in immediate need of some kind of attention?

labor and industry." (*Myers* v. *Richfield Oil Corp.* (1950) 98 Cal.App.2d 667, 671 [220 P.2d 973]; see *Levy* v. *Superior Court* (1940) 15 Cal.2d 692, 704 [104 P.2d 770, 129 A.L.R. 956].) But the corollary to the rule is that the award must be coextensive with the submission. In fact, the only grounds for setting aside an arbitration award are as set forth in Code of Civil Procedure section 1286.2. (*State Farm Mut. Auto. Ins. Co.* v. *Guleserian* (1972) 28 Cal.App.3d 397, 402 [104 Cal.Rptr. 683].) Subdivision (d) of that section provides that the court shall vacate the order if it determines that "The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." And, as heretofore noted, the collective bargaining agreement between the parties likewise unequivocally provided that "The decision of the umpire shall be specifically limited to the matter submitted to him."

■ An arbitrator thus derives his power solely from the arbitration agreement and he cannot exceed his derived powers. "There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate and which no statute has made arbitrable." (*Freeman* v. *State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481 [121 Cal.Rptr. 477, 535 P.2d 341].)

"The powers of an arbitrator are limited and circumscribed by the agreement or stipulation of submission." (*Pac. Fire etc. Bureau* v. *Bookbinders' Union* (1952) 115 Cal.App.2d 111, 114 [251 P.2d 694]; see *Bierlein* v. *Johnson* (1946) 73 Cal.App.2d 728, 733 [166 P.2d 644]; *Crofoot* v. *Blair Holdings Corp.* (1953) 119 Cal.App.2d 156, 184 [260 P.2d 156].) Where an arbitration award purports to decide unsubmitted issues, a vacation of the award is required as being in excess of the arbitrator's powers within the meaning of section 1286.2, subdivision (d) of the Code of Civil Procedure. (*Crofoot* v. *Blair Holdings Corp., supra,* at p. 187; *Bierlein* v. *Johnson, supra,* at p. 735; see also *Meat Cutters Local No. 439* v. *Olson Bros., supra,* 186 Cal.App.2d 200 at p. 204; *Patrick J. Ruane, Inc.* v. *Parker* (1960) 185 Cal.App.2d 488, 500 [8 Cal.Rptr. 379]; *William B. Logan & Associates* v. *Monogram Precision Industries* (1960) 184 Cal.App.2d 12, 17 [7 Cal.Rptr. 212]; and *Jefferson Ins. Co.* v. *Superior Court* (1970) 3 Cal.3d 398, 403 [90 Cal.Rptr. 608, 475 P.2d 880].)

■ We are constrained by the foregoing authorities to hold that in the instant case the arbitrator never reached the only issue that he was to decide, namely, whether Company had just cause to discharge Platt. He

avoided that issue, holding instead that: *"This award is based only on the fact that Management erred on February 13th by participating in a police action, resulting in an invasion of privacy."* (Italics added.)

This was apparently on the theory that Company was estopped from raising the issue of just cause, notwithstanding the stipulation of the parties, because of what the arbitrator regarded as "an invasion of [Platt's] privacy." In other words, Company was to be barred from exercising its disciplinary rights under the Union contract only on the basis of something that was not in issue in the case, the arbitrator's determination that Armstrong had acted improperly. This was obviously an extraneous matter having nothing whatever to do with the single question submitted to him for decision—whether Company had just cause for discharging Platt. Moreover, we are mindful of the fact that it was the room clerk, not Armstrong, who decided to call the police.

True, Platt would not have been able to report for work on either February 17th or 19th, as he was still in custody on criminal charges. But by what stretch of the imagination could this be attributed to any fault on the part of Company?

Nor does this come within the class of cases cited by respondent such as *McKay* v. *Coca-Cola Bottling Co.* (1952) 110 Cal.App.2d 672, 677 [243 P.2d 35], and *Grunwald-Marx, Inc.* v. *L. A. Joint Board* (1959) 52 Cal.2d 568 [343 P.2d 23], holding that where an arbitrator acts within the confines of his authority, the mere fact that he arrives at a determination on the basis of faulty reasoning or logic is of no moment.

The rule that is clearly controlling here is succinctly expressed in *Campbell* v. *Farmers Ins. Exch.* (1968) 260 Cal.App.2d 105 at pages 111-112 [67 Cal.Rptr. 175]: "While ordinarily where an issue is within the scope of the submission agreement and the parties have agreed to be bound by an award, errors in law or in fact committed by the arbitrator are not grounds for vacating the award [citations], where the error appears on the face of the award and causes substantial injustice, the award may be vacated. [Citations.]"

Other authorities cited in respondent's brief do not support a conclusion different from the one we have heretofore arrived at. In *Grunwald-Marx, Inc.* v. *L. A. Joint Board, supra,* 52 Cal.2d 568, for example, the sole issue before the arbitrator was whether a union

violated a collective bargaining agreement effective from 1953 to 1956 by requiring the employer to make certain fringe benefit payments during that time. That contract provided—as did its 1947-1953 predecessor—that the employer did not have to make such payments if the union did not require them from its competitors. The arbitrator found that during a period prior to 1953 the employer had made such payments even though its competitors had not, and concluded that as of 1953, the employer had a credit for that amount and was entitled to cease payments under the 1953-1956 contract until the credit was cleared.

The union therefore argued that the arbitration award in effect included an award for the breach of the 1947 contract, and to that extent was in excess of the arbitrators' authority. To this the Supreme Court replied: "This is a misinterpretation of the award. The arbitrators did not purport to arbitrate any 1947 violations. The reasoning of the arbitrators was that, because of the breach of the 1947 contract the Company had been compelled to pay too much into the insurance fund." (*Grunwald-Marx, Inc.* v. *L. A. Joint Board, supra,* 52 Cal.2d 568 at p. 588.) The court held that there was nothing in the 1953 contract that precluded the company from setting off against future credits any balance that may have resulted from excessive or erroneous payments; that to do so would place a premium on the successful concealment of contract violations. "Even if the reasoning of the arbitrators were unsound, this would not invalidate the award." (*Id.,* at p. 589.)

And in *Ryan Aeronautical Co.* v. *International Union etc., Local 506* (1959) 173 Cal.App.2d 463 [343 P.2d 356], also cited by Union, the arbitrator found that the employer had failed to adhere to contractual provisions regarding the scheduling of the work week. In addition to this finding, the arbitrator also incidentally found that the employer was not entitled to attack the union in a bulletin issued to the employees, and that by doing so the employer violated the recognition provisions of the contract. This additional finding did not have the effect of altering, avoiding or vitiating the arbitrator's decision on the issue properly before him. In fact, the court pointed out (at p. 466) that it was merely a preliminary finding that was in no way incorporated in or even made part of the award.

The decision here was completely beyond the confines of the sole issue submitted for arbitration. The question before us on this appeal is, what was submitted to the arbitrator and what did he decide?

We conclude that instead of determining the single issue that he was called upon to resolve, the arbitrator decided an issue that was entirely outside the scope of the submission agreement. Indeed, from the face of the arbitration proceeding the only reasonable conclusion is that the arbitrator would have found that there was just cause for the discharge if he had decided that issue. Since he did not, we have determined for the foregoing reasons that the judgment must be reversed and the cause remanded with instructions to vacate the award.

Sims, Acting P. J., and Elkington, J., concurred.